DECISION
This matter is before the Court on the appeal of Gregory G. Holmes ("Holmes") from a decision of the Charlestown Zoning Board of Review (the "Board"). On July 17, 2007, Holmes sought a special-use permit pursuant to Sections 218-25 and 218-87 of the Town of Charlestown Zoning Ordinance (the "Ordinance") to install an individual sewage disposal system ("ISDS") for a three bedroom residential home less than one hundred (100) feet from a wetland within a flood zone. The Board's decision issued on May 6, 2008, denied Holmes' request for a special-use permit to install an ISDS citing concerns over surface water management. Principally, Holmes contends the Board's decision is an abuse of discretion because the Board required him to design a storm water management plan for a one hundred (100) year storm event, when the Town of Charlestown (the "Town") has no specific regulations or local standards for the control or maintenance of surface water. On May 19, 2008, Holmes filed the instant, timely, appeal to this Court. Jurisdiction in this Court is pursuant to G.L. 1956 § 45-24-69. *Page 2 
For the reasons set forth herein, this Court reverses the Board's decision.
 I Facts and Travel
Holmes is the owner of a parcel of property located on Old West Beach Road in Charlestown, Rhode Island, more specifically identified as Assessor's Map 2, Lot 108 (the "Property"). The Property is located near the shoreline, approximately 500-600 feet from the Atlantic Ocean, and adjacent to the "Central Beach" area of Charlestown. The Property is approximately 1.32 acres in size and located in a 2 acre zoning district, but is a legal non-conforming lot of record. At the time of the application for the special-use permit, the Town assessed the Property at $629,900. The Property, along with the contiguous developed area, is located within a flood zone, mapped by the Federal Emergency Management Agency. The Property is located in an area of forested wetlands. As a result, the proposed ISDS is located within the vicinity of two wetlands. One wetland is located approximately 180 feet away from the ISDS and therefore meets the Town's one hundred (100) foot setback requirement. A second wetland is located across Old West Beach Road to the west, seventy-eight feet away from the proposed septic system, less than the one hundred (100) feet required by Section 218-87 of the Ordinance, requiring a special-use permit.
Prior to applying to the Board, on October 26, 2006, Holmes received a permit from the Rhode Island Department of Environmental Management ("DEM") to install an "alternative/innovative" septic system known as the ADVANTAX AX20. The ADVANTAX AX 20 is a denitrification system.[1] DEM's approval of the ISDS included the grant of a variance *Page 3 
to locate the septic system within a flood plain. After securing permission from DEM, Holmes filed an application for a special-use permit with the Town to locate the ISDS closer than one hundred (100) feet to a wetland and within a flood zone. Holmes' application for a special-use permit commenced on July 17, 2007, and additional hearings were held on November 8, 2007, November 29, 2007, January 29, 2008, February 28, 2008, and May 6, 2008. After the conclusion of the first hearing, Richard T. Stabnick, Sheryl Stabnick, Jennifer Joy Stabnick, Courtney Claire Stabnick, and Ferdie Bettinger (the "Intervenors") acquired counsel to represent their objections to the special-use permit. At the final hearing on May 6, 2008, the Board denied Holmes' petition for a special-use permit, because two Board members failed to approve the application.[2]
At the hearings, Holmes presented four witnesses, all accepted by the Board as experts in their respective fields: Joseph Frisella ("Frisella"), civil engineering; Linda Steere ("Steere"), wetlands; Dr. Daniel Urish ("Urish"), hydrology; and Edward Caswell ("Caswell"), a certified real estate appraiser. The Intervenors presented two witnesses, both of whom were accepted as experts in their respective fields: Stanley Szczsponik ("Szczsponik"), civil engineering; and Susan Moberg ("Moberg"), wetlands. Additionally, at the November 8, 2007 hearing, the Board introduced Richard Pastore ("Pastore") as its own expert "to give advice in cross-examining, his opinion as far as the ISDS systems and such."
At the July 17, 2007 hearing, Holmes first presented testimony from Joseph Frisella. *Page 4 
Frisella estimated that he had designed over 6,000 septic systems during the course of his career and that in excess of one hundred (100) of those were "alternative/innovative" systems. He also testified extensively as to the denitrification that occurs within these systems and how that effects the environment. Frisella also explained that these systems have an operations and maintenance agreement requirement as part of DEM approval. These operations and maintenance agreements provide for regular inspections and upkeep. Additionally, Frisella testified to each of the criteria under Section 218-87, with the exception of the direction of groundwater flow and location of wetlands.[3]
At the hearing on November 8, 2007, Holmes continued with testimony from Frisella regarding a storm water management plan, which he prepared to illustrate that surface water drainage would be adequately handled on the Property. Frisella also testified that the Town has no specific published criteria for the creation of a storm water management plan. As such, he testified that in order to create a storm water management plan, one must first know the characteristics of the site, including size, slope, soils, and amount of fill. After determining that information, the designer then selects a type of stormevent (i.e. a two (2) year storm, ten (10) year storm) and determines the amount of existing runoff for the site. Next, the developer determines the increase in runoff which would result from the site being developed with the proposed improvements. For this hearing, Frisella prepared calculations for a two (2) year, twenty-four (24) hour storm event, as well as a twenty-five (25) year, twenty-four (24) hour storm event. According to Frisella, the additional runoff created on the Property post-development under a two (2) year storm would be 684 cubic feet of water. For the twenty-five (25) year storm event, the additional runoff would be 917 cubic feet of water. Frisella then *Page 5 
detailed how the storm water management plan would accommodate the extra water.
After presenting the facts concerning the two (2) and twenty-five (25) year storms, a member of the Board inquired as to why Frisella failed to design a storm water management plan for a fifty (50) or one hundred (100) year storm. Pastore then suggested:
 I'd like to say that it's common practice that a 100-year storm be analyzed in pre and post-development. I have not reviewed this yet. To be conservative, and the understanding in the area that we are in and some other aspects that we'll get into with respect to this, I think, as he says, there's the ability to accommodate the 100-year storm, which is common in other communities, that there's no reason why, perhaps, you shouldn't entertain that idea.
At this point in time, Holmes' counsel reminded the Board that the Town had no published criteria for storm water designs. After substantial discussion and disagreement, Holmes ultimately agreed to re-design the plan to accommodate a one hundred (100) year storm to the extent it was practical.
Frisella's testimony continued, and he discussed more aspects of the monitoring and maintenance component of the ADVANTEX system. He testified the system would be inspected every six months. Frisella was also cross-examined on his opinions regarding the applicability of certain regulations being promulgated by the Rhode Island Coastal Resource Management Council ("CRMC").
Daniel Urish also testified at the hearing on November 8, 2007, and was accepted by the Board as an expert in hydrology. During his testimony, Urish outlined how he conducted a study of how the groundwater on the site flows in a general westerly direction, towards the wetland across Old West Beach Road. According to Urish, the groundwater travels at a rate of one (1) to two (2) feet per day across the Property. Urish also testified that the construction of a building's foundation would have no effect on the direction of groundwater flow. *Page 6 
The hearing continued on November 29, 2007, and at this hearing Holmes presented testimony from Linda Steere. Steere testified that she had been out to the Property on at least a half-dozen occasions since 2004, and described the wetland on the Property as a "forest wetland." According to Steere, a "forested wetland" is predominantly trees and is less than three acres in size. Steere testified the wetland located on the Property was at least one hundred and eighty (180) feet from the proposed leachfield. Further, Steere testified that the second wetland, located across Old West Beach Road to the west, was called a contiguous coastal wetland. Steere testified that a contiguous fresh water wetland is described as such because it is contiguous to a coastal wetland or salt marsh. In addition, Steere also testified she had been present at the previous meeting and did not agree with Pastore's interpretation of CRMC's regulations.
Steere testified she did not have any concerns about the effect of the proposed ISDS on either of the wetlands, because the groundwater flows away from the wetland to the west. Steere also indicated there is a sufficient distance between the ISDS's proposed location and the onsite wetland. Additionally, Steere was also asked and answered a number of questions regarding CRMC's application. After questioning from members of the Board, Steere explained that as a biologist she looks for particular issues when considering a proposal. First, she looks to see if any of the proposed alterations are to occur in a "biological wetland" to assess potential threats to the wildlife habitat and flooding. Steere explained Holmes' proposal did not require any kind of building within a biological wetland. Further, Steere answered questions from the Board about the possibility of nitrogen and pathogens accessing the wetland across Old West Beach Road. According to Steere's testimony, she had no concern that pathogens would still be alive by the time they reached the wetland. Additionally, Steere indicated that if nitrogen reached the *Page 7 
wetland it would be used beneficially by the plants located within the freshwater wetland.
Holmes' final witness was Edward Caswell, who was admitted as a real estate expert. Caswell testified that at the time of the hearing Holmes' property was assessed by the Town of Charlestown for $629,900. Caswell also conducted a survey of the lots in the surrounding area and noted the area was entirely residential. As part of the survey, Caswell also analyzed whether the proposed plan for development of the Property would be consistent with the neighborhood. According to Caswell, the proposal to develop the Property fit squarely within the typical lot coverage for the neighborhood. Caswell further testified that the proposal was very consistent with the Town's Comprehensive Plan and the Ordinance. Caswell also noted that use of the Property as a single-family dwelling would not disrupt the neighborhood because the proposal is consistent with other homes in the neighborhood. Finally, Caswell testified that if Holmes' application for a special-use permit was not granted, the Property is worth very little, possibly in the low thousands of dollars.
Another hearing was held on January 29, 2008, at which time Holmes submitted correspondence signed by Mohammed Frej of DEM's ISDS permitting department. Holmes submitted this documentation to demonstrate he would not have to return to DEM for additional permitting if his application was granted. Holmes also submitted additional information to increase the storm management plan from a twenty-five (25) year storm to a one hundred (100) year storm, as requested at the prior meeting. Specifically, the change to the storm water management plan indicated that the "depressed area" of the Property is located at least twenty-five (25) feet away from the ISDS. Frisella testified again and explained to the Board that additional information was provided in the narrative report to clearly identify the pre-development and post-development runoff characteristics of the Property. During his testimony, *Page 8 
Frisella indicated that in making the calculations for the report, runoff curve figures were used from the Rhode Island Storm Water Design and Installation Standards Manual. He testified that the figures in the manual are based on soil types and the type of foliage, or lack thereof, on a site.
The hearing continued with the testimony of Stanley Szczsponik, accepted as an expert in engineering, who testified on behalf of an abutter. Szczsponik acknowledged he was primarily involved in large-scale projects, and not single family home development. Similar to Frisella, Szczsponik acknowledged the first thing he did in reviewing the proposed plan was to check to see what the Town's regulations were on the issue. Szczsponik also noted that he did not believe the Town had any regulations in effect for storm water management. Szczsponink then went on to testify that he did not believe the proposed storm water management plan met the requirements of the Rhode Island Storm Water Design and Installation Manual for several reasons: (1) the proposal did not have a three foot separation from the bottom of the leachfield to the seasonal high-water table; (2) the infiltration areas were less than one hundred (100) feet from Holmes' private well and less than twenty-five (25) feet from a septic system; (3) the infiltration systems did not have a minimum setback from the buildings and foundations; (4) the infiltration rate used for the design did not fall within the allowable infiltration rates per the manual; and (5) the proposed plan did not meet the requirement of being able to drain out in seventy-two (72) hours. As a result, Szczsponik concluded the proposed plan did not meet generally accepted engineering practices. Szczsponik also concluded that runoff will not flow toward the proposed "depressed" area on the plan, but that it will run into the street. Additionally, Szczsponik testified that he believed the report contained a calculation error which meant the proposed plan could not accommodate a one hundred (100) year storm. In fact, Szczsponik asserted the only storm event the proposed plan could accommodate was a two (2) *Page 9 
year storm event; any other storm event would result in runoff going into the street.
During cross-examination, Szczsponik acknowledged his calculations and conclusions were based upon the gross runoff generated by the site in its entirety, and not the net increase in runoff due to the development of the parcel.[4] Moreover, although Szczsponik testified this plan would not be approved by DEM, he also acknowledged during cross-examination that storm water management plans are not a DEM requirement for septic systems.
The next witness to testify was Susan Moberg, who was admitted as an expert soil scientist. Moberg's testimony centered on whether the proposed plan would meet certain CRMC proposed guidelines. Moberg read from the proposed CRMC regulation, "[h]igher sea levels will result in changes to surface and ground water characteristics. Salt intrusion into aquifers will contaminate drinking water supplies and higher water tables will compromise waste water treatment systems in the coastal zone." According to Moberg, the Property currently sits from seven (7) to nine and a half (9.5) feet above sea level. Moberg acknowledged the ISDS as designed satisfied current standards and is the most current technology. However, Moberg noted the proposed CRMC regulations indicate sea level may rise to a level that would compromise existing septic systems and drinking water supplies. Her main area of concern was for the "cumulative impact" over the future in a changing environment.
After the conclusion of Moberg's testimony, the Board called its engineer, Richard Pastore, to provide input on some of the issues raised by Szczsponik's testimony. Pastore noted that both Szczsponik and Frisella approached the issue of storm water in a very intricate manner, *Page 10 
one not typically applied to a residential lot of this size. He acknowledged that no storm water plan is going to catch every "molecule" of water, but that the areas being proposed "are big enough that they will catch everything that falls on them. They take what they are supposed to take. Plus, they take the water that was running off the property anyways. They do double duty." Further, Pastore acknowledged Frisella's method of calculation and design was an accepted procedure, one Pastore used. According to Pastore, Frisella's calculations took no "credit" for the infiltration of storm water that will occur on the Property which meant the plan will accommodate even more runoff. Additionally, Pastore stated the Town has no regulations for storm water management, and that there are no regulations requiring a separation of runoff from roofs or gutters.
Pastore acknowledged the proposed septic system achieves a high degree of treatment and is very dependable. He also testified that although he was not an expert in wetlands, he saw no problem for the wetlands that would be caused by the installation of the ISDS. When asked how development of the Property might alter its character, Pastore indicated that when vegetation is removed more runoff is created, but that the "runoff has been dealt with." After being asked his opinion of the proposed storm water management plan, Pastore stated that Frisella's plan was a reasonable way of doing it.
After hearing from Pastore, the Board heard comments from several abutters and members of the public. The first individual to testify was David Brown ("Brown"), an abutter, who testified the Property was at the northeast portion of a multi-acre wilderness and believed that any development would present a "sharp break-with the neighborhood's history. Brown also felt that the human intrusions associated with development: radios, televisions, stereos, appliances, and the commotion caused by individuals exiting and entering the property would *Page 11 
contaminate the neighborhood. In his opinion, the development of the Property would "violate both the history and traditions which we ought to protect." When asked what Holmes should do with the Property, Brown indicated he should give it to the South County Conservancy. Brown also indicated his family had "preserved" a number of acres across the street which had been given to the South County Conservancy. However, Brown later indicated he did not give his land to the Conservancy, but rather that he received both compensation and tax credits.
The next individual was Moira Brown, who read a letter from her aunt, Fredericka Bettinger ("Bettinger"), the owner of an abutting home, who was unable to attend the hearing. Bettinger's letter posed several questions to the Board about the merits of the application. In her letter, Bettinger indicated she had lived across the street from the Property for thirty-five (35) years, and been summering in the community since 1932. Bettinger's letter discussed her personal familiarity with standing water issues along Old West Beach Road and the Property. According to Bettinger, storm water recently covered more than half of the north side of Old West Beach Road for more than two weeks. Bettinger's letter indicated she believed the development of the Property would only exacerbate the existing storm water issues, and her letter concluded by requesting that the Board deny the application.
Leo Mainelli (Mainelli"), who is not an abutting property owner, but lives further up the road testified before the Board next. Mainelli also testified that on certain occasions there is standing water on Old West Beach Road. Additionally, Mainelli wanted the Board to be aware he believed additional "overflow" would potentially be deleterious to wildlife in the area. Mainelli likened the approval of this application to "death by 1,000 cuts. This is cut 521."[5] It was Mainelli's belief the Property should be put into a trust, or that somebody should "buy-out" *Page 12 
Holmes.
The next witness to testify before the Board was Virginia Wooten ("Wooten"), a "land steward" for the Harry Hathaway Preserve under the South County Conservancy. Wooten expressed her opinion that the development poses a threat to the drinking and ground water supply. Additionally, Wooten was also concerned about threats that occur during the building process and nitrates.
Arthur Ganz ("Ganz"), President of the Salt Pond Coalition, was the next objector to testify. Ganz testified about a nutrient loading and pollution study for the Green Hill Pond and eastern Charlestown Pond. Ganz also spoke about global warming. Finally, Ganz claimed the technology being used for this ISDS was designed to repair existing septic systems, not "an excuse to make marginal wet, low-lying areas buildable."
The final witness at the hearing on January 29, 2008, was Katherine Waterman ("Waterman") a Town Councilor for the Town. Waterman began by stating that her views may not be those of the entire Council. According to Waterman, she has been in the area for fifty (50) years and has seen water on the Property on a number of occasions. Warterman also testified that DEM's requirements were the minimum and that the Town could exceed DEM's requirements. Further, Waterman indicated the Property was an "encephalitis corner" and a health hazard, full of swarms of mosquitoes. Waterman accused the Board of treating this application like "a typical building lot" and the Board responded by noting the Town Council could help the Board by enacting laws for dealing with groundwater. The meeting concluded with a motion by the Board to have Pastore submit additional comments in writing.
On February 22, 2008, another meeting occurred to review a report submitted to the Board by Pastore on February 22, 2008. The report prepared by Pastore reviewed the storm *Page 13 
water management calculations prepared by Frisella on November 30, 2007, Szczsponik's written memorandum, and Frisella's comments dated February 12th. However, a problem arose when it was determined Pastore entered onto the Property without Holmes' permission to conduct a soil analysis. The purpose of the incursion was to "examine the soils in five different areas" to determine whether the soil was properly categorized as "sandy loam." Much of the testimony that occurred during this hearing related to this issue and a conversation between Pastore and opposing counsel. Ultimately, the parties came to a determination that any reference to the soil analysis would be excluded from the proceedings.
At the hearing, the parties also came to an agreement on how to proceed with a review of the various memorandum submitted during the hearings. The parties agreed they would proceed by allowing each expert to comment and answer questions by the Board regarding their reports. By the end of the February 28, 2008 hearing, the parties had concluded the process of reviewing Frisella's and Szczsponik's reports.
The final hearing in this case was held on May 6, 2008. At this hearing, Pastore was not present for cross-examination on his report, and Frisella commented on and rebutted some of the items contained in Pastore's report. Upon conclusion of this testimony, the Board denied Holmes' request to file a brief in the case and both parties delivered an oral summation. A motion to deny the application followed. Three members of the Board indicated they were going to approve the application, and two voted to deny. Thus, although the motion to deny the application failed, the practical effect was still a denial of the application. Each member then spoke about the application, which ultimately became the Board's written decision.
The Board's decision, which is written in a narrative format, lacks any specifically enumerated findings of fact, and contains the first person opinion of Board members without *Page 14 
reference to who is speaking. Comprehending the Board's decision is challenging. Although the decision does not make specifically enumerated findings of fact, the portion of the Board's decision voting to deny the application made a number of findings regarding the Property. First, the decision notes "there is considerable dispute over storm water management, surface water management, existing soil types and infiltration factors." The decision goes on to state, "it is possible that the proposed drainage system will at times be overwhelmed, depending on the intensity and duration of storms." In addition, the decision notes the testimony from Frisella and Szczsponik "are significantly different." Further, the decision also notes, "Pastore further questioned Mr. Frisella's determination of soil types on site." Moreover, the decision states, "[r]unoff may flow off the site and exacerbate the inevitable flooding that occurs on the road and contiguous properties." The decision also notes concern over "the less than 50' distance to the wetland preserve on the other side of West Beach Road as recommended by CRMC" and additional concerns because "[t]he scope of the project does not meet minimization and impact avoidance requirements of CRMC regulations. It has been proposed at a level that maximizes financial gain at the cost of potentially creating conditions that will adversely affect the public health and safety."
 II Standard of Review
Rhode Island General Laws 1956 § 45-24-69 provides this Court with the specific authority to review decisions of town zoning boards. Under § 45-24-69(d), this Court has the power to affirm, reverse or remand a zoning board decision. In conducting its review, "[t]he court shall not substitute its judgment for that of the zoning board . . . as to the weight of the evidence on questions of fact." Section 45-24-69(d). This Court may reverse or modify the *Page 15 
zoning board's decision only "if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Id.
Judicial review of administrative action, including zoning decisions, is "essentially an appellate proceeding." Notre DameCemetery v. Rhode Island State Labor Relations Bd.,118 R.I. 336, 339, 373 A.2d 1194, 1196 (1977); seealso Mauricio v. Zoning Bd. of Review of the City ofPawtucket, 590 A.2d 879, 880 (R.I. 1991).
As to this Court's review of a zoning board's factual findings, the Superior Court "lacks [the] authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute [its] findings of fact for those made at the administrative level."Restivo v. Lynch, 707 A.2d 663, 665 (R.I. 1998) (quotingLett v. Caromile, 510 A.2d 958, 960 (R.I. 1986)). Rather, the trial justice "must examine the entire record to determine whether `substantial' evidence exists to support the board's findings."DeStefano v. Zoning Bd. of Review of Warwick,122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979). "Substantial evidence is relevant evidence that a reasonable person would accept as adequate to support the board's conclusion and amounts to `more than a scintilla but less than a preponderance.'" Lischio v. ZoningBd. of Review of the Town of North Kingstown,818 A.2d 685, 690 n. 5 (R.I. 2003) (quoting Caswell v. GeorgeSherman Sand and Gravel Co., Inc.,424 A.2d 646, 647 (R.I. 1981)). In short, a reviewing court may not substitute its judgment for that of the board's if it "`can conscientiously find that the board's decision was *Page 16 
supported by substantial evidence in the whole record.'" MillRealty Assocs. v. Crowe, 841 A.2d 668, 672 (R.I. 2004) (quotingApostolou v. Genovesi,120 R.I. 501, 509, 388 A.2d 821, 825 (1978)).
 III Analysis
Principally, the parties disagree over whether the Board properly executed its statutory duties when ruling on Holmes' request for a special-use permit. Section 218-25 of the Ordinance provides:
 A special use permit may be approved by the Board following a public hearing if, in the opinion of the Board, that evidence to the satisfaction of the following standards has been entered into the record of the proceedings:
 (1) The public convenience and welfare will be substantially served;
 (2) It will not result in adverse impacts or create conditions that will be inimical to the public health, safety, morals and general welfare of the community;
 (3) The requested special use permit will not alter the general character of the surrounding area or impair the intent or purpose of this Zoning Ordinance or the Comprehensive Plan upon which this Ordinance is based;
 (4) That the granting of a special use permit will not pose a threat to drinking water supplies;
 (5) That the use will not disrupt the neighborhood or the privacy of abutting landowners by excessive noise, light, glare, or air pollutants;
 (6) That the sewage and waste disposal into the ground and the surface water drainage from the proposed use will be adequately handled on site;
 (7) That the traffic generated by the proposed use will not cause undue congestion or introduce a traffic hazard to the circulation pattern of the area.
In addition to Section 218-25 of the Ordinance, Holmes was also subject to Section 218-87 of the Ordinance which provides: *Page 17 
 Generally. No facility designed to leach liquid wastes into the soil shall be located in areas outlined below, except by the granting of a special use permit. Exception: The repair or alteration of an existing waste disposal system.
 (1) Within one hundred feet of a boundary of a fresh water or coastal wetland as defined by Rhode Island General Laws §§ 2-1-14 and 2-1-20;
 (2) That area of land within two hundred feet of the edge of any flowing body of water having a width of ten feet or more and that area of land within one hundred feet of the edge of any flowing body of water having a width of ten feet or less; and
 (3) That area of land within one hundred feet of the edge of any intermittent stream; and
 (4) The area of land defined as a one hundred year flood hazard boundary indicated by Zone A or Zone V on the official Flood Insurance Rate Maps of the Town of Charlestown prepared by the Federal Emergency Management Agency and dated September 30, 1995 and any and all revisions thereto.
Section 218-87(c) the Ordinance also requires ISDS systems in Charlestown to meet certain submission requirements:
 Submittal Requirements. The following information shall be submitted by the applicant as part of the special use permit application relating to water bodies:
 (1) Proximity to the one hundred year flood hazard boundary;
 (2) Location of coastal features and relationship to jurisdiction of the RI CRMC and special area management plans that may be in effect;
 (3) The location and delineation of, and distance from the nearest groundwater aquifer and all wells used for drinking water supply within four hundred feet;
 (4) Proximity to Class SA and/or Class A water body or areas where the water quality is suitable for harvesting shellfish for direct consumption, where applicable;
 (5) Soil types present on the site as defined in the Soil Survey of R.I. of the United States Department of Agriculture;
 (6) Depth of soil to water table;
 (7) Perk rates of all soils on the site between the site and any water body;
 (8) The presence or absence of fragipan between the soil surface and groundwater;
 (9) Detailed soil morphological characteristics to a minimum depth *Page 18 
of four feet as analyzed by a professional soil scientist, to determine seasonal high-water table;
 (10) Direction of groundwater flow;
 (11) The dimensions of the proposed structure, and the square footage apportioned to living space;
 (12) Precise reference points to locate the property and the proposed ISDS site;
 (13) The surveyed edge of all coastal and/or freshwater wetlands within one hundred feet of the leach field as verified by the RI DEM or RI CRMC.
In addition to the provisions of the Ordinance previously outlined, the Town also has adopted a wastewater management ordinance (the "WMO") under Section 210-1, which establishes a Wastewater Management District. Section 210-2(A) of the Ordinance indicates the purpose of the WMO is to "allow for coordination and consistent wastewater management programs at both the state and local levels." Additionally, Section 210-8(B)(2)(a) of the Ordinance provides it shall be the duty of the Wastewater Management Commission (the "WMC") to "[s]upervise the administration of a program of surface water and groundwater protection through maintenance and inspection of individual sewage disposal systems as authorized by this ordinance and Title 45, Chapter 24.5, of the Rhode Island General Laws." Section 210-8(B)(2)(b) requires the WMC to "develop rules and regulations for the implementation of the ordinance."[6]
Against this backdrop, Holmes contends the Board's decision is effected by numerous errors of law, the result of which is an arbitrary and capricious decision warranting reversal. Conversely, the Board and the Intervenors contend the Board's decision contained sufficient findings of fact and conclusions of law, and that substantial competent evidence exists in the record to support the Board's decision to deny the special-use permit. InCitizens to Preserve *Page 19 Overton Park, Inc. v. Volpe,401 U.S. 402, 416 (1971) (overruled on other grounds byCalifano v. Sanders, 430 U.S. 99 (1977)), the United States Supreme Court stated that to make a finding of arbitrariness, capriciousness or an abuse of discretion, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." After a thorough review of the record, this Court is satisfied the Board's decision is the result of numerous errors of judgment, the result of which is an arbitrary and capricious decision.[7]
 A Board's Decision
As previously mentioned, the Court notes that the Board's decision is inartfully drafted and quite difficult to comprehend. The decision lacks any specifically enumerated findings of fact or conclusions of law. Rather, the decision itself is written in a narrative format with the first person opinion of Board members inserted into the decision. However, the individual Board member giving the opinion is not identified in the decision. Additionally, at various points in the decision the Board member speaking changes without any reference to that change. This issue is compounded when reading the decision because the decision also contains the opinions of dissenting Board members. As a result, the decision effectively contains a "dissent," but no reference differentiates between the Board's decision and the "dissent."
Further, the Court also notes that the Board's decision contains numerous conclusory statements, with little or no reference to the facts or law that support the conclusions. For example, this issue is evidenced by the Board's statement that "[the application] has been proposed at a level that maximizes financial gain at the cost of potentially creating conditions *Page 20 
that will adversely affect the public health and safety." Yet, following this statement the Board's decision lacks any discussion of how Holmes' application was designed to maximize financial gain or how conditions will be created that will adversely affect the public health and safety. The Board held six evidentiary hearings regarding Holmes' application and at a number of these hearings Holmes' counsel indicated a desire to provide briefs to the Board about the issues facing it. Given the number of issues facing the Board in this matter, the Court believes it would have been advisable for the Board to have received and considered the parties' briefs prior to issuing its decision on the final night of hearings. Indeed, the Court agrees with Holmes statement that "[h]ad the Board taken the extra time to compose its thoughts in [a] cogent manner, perhaps this review and analysis would not be so tedious."
Against this backdrop, the Court is reluctant to proceed with appellate review of the Board's decision in its current state. However, Holmes asserts that although "[t]he Board's decision is a rambling of disjointed statements which do not serve to resolve evidentiary conflicts and fails to supply ultimate conclusions of law . . . it is nevertheless capable of review." As a result, based upon the parties' insistence that the Board's decision is capable of review and the extensive briefing conducted by the parties in this matter, the Court proceeds with a review of Holmes' application. See Curan v. Pierhal, No. 2004-0280, 2005 WL 789667, at *5-6 (R.I. Super. April 1, 2005) (concluding that although the findings and determination of the board were inartfully drafted, where the board's intent and analysis are apparent from record, remand for further proceedings was unnecessary).
 B 100 Year Storm Request
Principally, Holmes asserts the Board's request to design a storm water management plan *Page 21 
for a one hundred (100) year storm was error. Holmes acknowledges that municipalities are free to implement stricter standards than DEM's requirements, but asserts the Board may not enact and enforce greater restrictions in a particular application in the absence of "written, objective criteria within the Zoning Ordinance or the Wastewater Management Ordinance." According to Holmes, although the Town has enacted a WMO empowering the Wastewater Management Commission to "supervise the administration of a program of surface water and groundwater protection" and to "develop rules and regulations for the implementation of the ordinance," no such rules or regulations have been adopted. Holmes argues that in the absence of specific requirements, an applicant must "guess at what the Town wants as far as storm water management." According to Holmes, such an approach "gives the Zoning Board wide latitude to play fast and loose with applicants" allowing the Board "to raise the submission bar high enough to where the applicant can't meet it and then deny" the application.
Moreover, Holmes asserts that unless the criteria are published in advance, an applicant is unable to discern whether or not a variance will be required. In this case, Holmes initially prepared a plan to accommodate up to a twenty-five (25) year storm event. Attempting to placate the Board, Holmes endeavored to design a one hundred (100) year storm event. However, Holmes states that in attempting to design such a plan it became infeasible because during a one hundred (100) year storm event the entire coastline would be flooded. According to Holmes, during a one hundred (100) year storm event the Property and the entire neighborhood, all located in a flood plain, would be flooded. Thus, Holmes asserts the Board's request for a one hundred (100) year storm event, knowing "the entire coast would be under water," and subsequent conclusion that "surface water drainage from the proposed use will not be adequately handled on site" was error. *Page 22 
Conversely, the Board and the Intervenors argue that under G.L. § 45-24-29, the Board is allowed "to establish and enforce standards and procedures for the proper management and protection of land, air, and water as natural resources." According to them, pursuant to this authority "[t]he Board could impose standards on ISDS special use permits to protect the future needs of the community and the future potential threats to the coastal environment." According to the Board and the Intervenors, although "[Holmes] makes much ado about the Board's suggestion that he present a ISDS design to address a 100 year storm. . . . it must be recalled that a continuance was granted . . . and additional public hearings were held so that the design could be explained and defended before the Board." As such, they contend any claim of unfairness or lack of guidelines must be viewed as moot and meritless. Additionally, the Board and the Intervenors assert the Board's suggestion to design a one hundred (100) year storm plan "was not out of the ordinary and was in line with many municipalities similar to Charlestown" and resulted after "[t]he Board's own expert consultant made [the] recommendation based upon his expert opinion that such a design requirement was common practice." Finally, they argue "the personal experience of Board members who experienced hurricanes in their lifetime further substantiated this standard for an application for this unique parcel located between two wetlands."
In his rebuttal brief, Holmes argues the Board and the Intervenors' claims regarding mootness "completely fails to grasp the true nature of due process." According to Holmes, "this very situation highlights [] the reason why objective criteria have to be vetted and adopted by the regulatory body with authority and then published for all to know and see in advance of making an application." *Page 23 
Under G.L. § 45-24-42(2), towns and municipalities are required to "[d]escribe the conditions and procedures under which special-use permits, of each or the various categories of special-use permits established in the zoning ordinance, may be issued." In this case, the Town has enacted Section 216-25 of the Ordinance, which contains the requirement that "sewage and waste disposal into the ground and the surface water drainage from the proposed use will be adequately handled on site" Further, although the Ordinance creates a WMC to "supervise the administration of a program of surface water and groundwater protection" and to "develop rules and regulations for the implementation of the ordinance," it is undisputed that specific regulations have not been adopted. As such, the Town lacks any enumerated or published criteria that require an applicant to design an ISDS to meet a particular storm event. Indeed, the only water management statutory requirement Holmes was required to meet for his application was Section 216-25 of the Ordinance stating, "sewage and waste disposal into the ground and the surface water drainage from the proposed use will be adequately handled on site." In its decision, the Board did not specifically cite the one hundred (100) year storm event as a reason for denying Holmes' request. However, from all that appears in the record and in reviewing the transcripts, this Court is satisfied the Board's conclusion "there is considerable dispute over storm water management, surface water management" is based upon the conflicting testimony that resulted from the Board's request for a one hundred (100) year storm event plan. In the absence of any published guidelines, this Court holds it was error for the Board to rely on the request for a one hundred (100) year storm event plan as a basis for concluding "[a disagreement exists] that surface water will adequately be handled on site . . . it is possible that the proposed drainage system will at times be overwhelmed, depending on the intensity and duration of the storms." See e.g.,Crowe, 841 A.2d at 682 (Finding that a board acted arbitrarily and *Page 24 
capriciously when it granted some permits and denied others "in the absence of any rational rule[,] standards[, or] . . . guidelines . . . to rely on in making [its] determination[s].").
In its review of the record, the Court notes the practical and legal problems created by the Board's request for a one hundred (100) year storm event in the absence of any specific regulatory criteria for water management manifested early in the application process. As the testimony before the Board revealed, when engineers design a plan to control surface water drainage from a proposed use, the first step is to review the applicable regulations for the site. Here, all of the parties to the case readily understood no published regulations existed for storm water management in the Town. Initially, Frisella prepared a storm water management plan that was designed to accommodate up to a twenty-five (25) year storm event. Frisella indicated he submitted a plan to this particular standard because he was being realistic. Pastore then immediately interjected that other communities require applicants to submit plans for a one hundred (100) year storm event, and that the Town should entertain such a standard as well. However, the problem with Pastore's suggestion, and ultimately the Board's request, is that this requirement is not published in the Ordinance or the WMO. As a result, as one member of the Board voting to approve the application noted, "the applicant's experts went the extra mile to satisfy a 100 year storm event as opposed to a 25 year storm event even though our ordinance does not require them to do so." The problems associated with requesting that an applicant submit materials to satisfy unpublished and unspecified requirements are numerous.
First, in the absence of objective published criteria, an applicant is left to guess as to the type of storm water management plan to design. As previously noted by the Court, a critical instruction contained in typical waste water ordinances is whether the applicant must design for the net increase in runoff caused by the installation of the septic system, or the entire runoff from *Page 25 
the site.[8] In reviewing the testimony of Frisella and Szczsponik, this Court notes much of the disagreement between the experts was based upon this distinction. The report prepared by Frisella accounted for the net increase of runoff generated as a result of the development of the parcel. Szczsponik disagreed with the calculations made by Frisella, and concluded the only storm event the plan could accommodate was a two (2) year event. However, during cross-examination, Szczsponik acknowledged his calculations were based upon the gross runoff generated by the site in its entirety and not the net increase due to the development of the parcel. As a result, because they were approaching analysis of the plan from different perspectives, this Court is unsurprised the Board concluded "there [was] considerable dispute over storm water management, [and] surface water management." Indeed, absent any guidance from the Ordinance as to applicable standards, it is unlikely any two engineers would reach the same conclusion regarding a proposed plan's ability to handle storm water.
Second, unless the criteria for storm water management are published in advance, an applicant is unable to ascertain whether the standards can be met. If the standards are published in advance, an applicant who is unable to meet the standards may opt to request a variance from the literal requirements of the specified ordinance. In this case, the difficulties in designing a plan to meet unspecified criteria became apparent when Holmes attempted to design a storm water management plan for a one hundred (100) year storm event. During its planning, Holmes learned that as a result of the properties' location within a flood zone such a design was infeasible. Although the creation of a plan was possible in theory, Frisella told the Board on a *Page 26 
number of occasions that during a one hundred (100) year storm event, the entire coastal area, including the neighborhood surrounding the Property, would be flooded. As Frisella testified with regard to the one hundred (100) year storm, "[t]he lot is covered with water. It doesn't make sense. That's why I'm giving you that testimony tonight."
Further, this case highlights why objective criteria are vetted and adopted by a regulatory body and then published for the public to make comment on. The proper avenue to require applicants to submit a plan for a hundred (100) year storm event is by act of a regulatory authority, in this case either by the Town Council or the WMC. If such a regulation was proposed, the appropriate regulatory body would have held a hearing where the public would have been able to voice any potential concerns. During the public hearing, the public could have raised concerns about the practicability of requiring such a plan when the entire area located in the flood zone would be completely inundated and flooded. Based on the complete lack of any objective, enumerated, or published criteria in the Ordinance, this Court is satisfied the Board erred in judgment when it requested that Holmes prepare a storm water management plan for a one hundred (100) year storm event, the result of which was an arbitrary and capricious decision. See e.g.,Tillotson v. City Council of Cranston,61 R.I. 293, 295, 200 A. 767, 768 (1938) (labeling as "arbitrary and unreasonable" a city council's decision not based on any "rule or standard"); see also MC. S. Realty, Inc. v. CityCouncil of City of Cranston,86 R.I. 179, 182, 133 A.2d 765, 766 (1957).
 C CRMC Regulations and Profit Maximization
Holmes also contends the Board erred as a matter of law when it denied his application based on the applicability of CRMC regulations and on speculation that his goal in developing *Page 27 
the Property was the realization of profits. According to Holmes, "[f]ar too much time was spent discussing the irrelevant issues of global warming, climate change and potential sea levels in the year 2100." Holmes asserts that the Board is a statutory entity that has no authority to determine whether the proposal meets the requirements of CRMC's regulations. Moreover, Holmes contends "[t]here was absolutely no testimony in the record whatsoever, as to the intentions of the owner for realizing profits." Although not specifically addressed by the Board and the Intervenors, both parties appear to argue the Board acted within its enumerated authority when it concluded "concerns regarding the environmental issues centering on the surface runoff into neighboring properties, the freshwater wetland, and coastal wetland across the street from the property were not satisfactorily addressed."
The Board's decision denying Holmes' application references CRMC regulations at two points. Specifically, the Board's decision states "[m]y further concern is the less than 50' distance to the wetland preserve on the other side of West Beach Road as recommended by CRMC" and "[t]he scope of the project does not meet the minimization and impact avoidance requirements of CRMC regulations." Holmes also takes issue with the statement in the decision which reads, "[the proposal] has been proposed at a level that maximizes financial gain at the cost of potentially creating conditions that will adversely affect the public health and safety." After reviewing the record and testimony with regard to these statements, the Court is satisfied it was error for the Board to consider these factors.
In this case, the Board had the authority to rule on applications for special-use permits pursuant to the enumerated criteria in Section 218-25 and Section 218-87 of the Ordinance. The authority to determine whether an application complies with the CRMC requirements is vested solely in CRMC pursuant to statute.See G.L. § 46-23-1 et. seq. If the Board had granted *Page 28 
Holmes' request for a special-use permit, he would then have been required to submit an application to the CRMC for approval. In this case, the Board made a clear an unequivocal statement in its decision that "[t]he scope of the project does not meet the minimization and impact avoidance requirements of CRMC regulations." In making this finding, the Board exceeded its authority and erred as a matter of law.
Moreover, after a review of the record, the Court is similarly satisfied the Board erred as a matter of law when it concluded "[the proposal] has been proposed at a level that maximizes financial gain at the cost of potentially creating conditions that will adversely affect the public health and safety." This Court is unable to find even a scintilla of evidence in the record to support the contention that Holmes' primary purpose is financial gain. At best, the record, specifically Pastore's testimony, indicates Holmes' father had recently sold a nearby property for over $6,000,000.00. The Court is unable to view the Board's determination of financial gain as anything other than rank speculation. As such, this Court holds the Board's determinations regarding CRMC guidelines and financial gain were arbitrary and capricious and substantially prejudiced Holmes.
 D Soil Analysis
Prior to the February 28, 2008 hearing, Pastore, operating under the belief he was acting as an agent of the Board, visited the Property without permission to obtain soil samples. Holmes' counsel objected strenuously to the consideration of Pastore's report because it was the product of an intrusion onto Holmes' property. After much discussion and debate over how to treat the report, a vote by the Board decided to eviscerate the portion of the report relating to the soil samples taken from the Property, while retaining Pastore's opinion regarding general soil *Page 29 
conditions derived from other studies and sources. Nevertheless, in the Board's decision it states, "[s]pecifically, there is considerable dispute over storm water management, surface water management, existing soil type and infiltration facts . . . Pastore further questioned Mr. Frisella's determination of soil types on site. He concluded that the soil types present would allow larger capillary rise of groundwater and slower infiltration of precipitation." (emphasis added)
Holmes argues it was error for the Board to agree not to consider Pastore's excursion onto the Property, yet then cite the dispute as to soil classification as one reason for denial. Specifically, Holmes argues he was unduly prejudiced because he did not pursue any cross-examination as to Pastore's methods of determining soil types after the Board agreed to exclude the information. Conversely, the Board and the Intervenors argue the decision by the Board only excluded the portions of Pastore's report related to his intrusion onto the Property. According to the Board and the Intervenors, the "bulk of Mr. Pastore's opinions regarding the soil type and infiltration on the property remained part of the record, and was properly considered by the Board as a basis for denying the special-use permit."
After a review of Pastore's report and testimony, this Court is satisfied it was error for the Board to rely on a "considerable dispute over . . . existing soil types and . . . Pastore['s] further question[ing] of Mr. Frisella's determination of soil types onsite" to deny the application. Although the Board and the Intervenors are correct that the Board only excluded the portion of Pastore's report related to his entrance onto the Property — when stripped from the report — Pastore's report and testimony lack any site specific grounds for disputing the soil classification of the Property. The issue of soil type first arose at the January 29, 2008 hearing, at which Pastore testified that the type of soil on the Property is "silt loam" and not "sand loam" as found by Frisella. Pastore based his opinion on the Rhode Island Soil Survey, which as Frisella pointed *Page 30 
out, is not a site specific survey. Unlike Pastore, Frisella compiled a detailed soil morphological report to determine the type of soil present on the Property as part of his work for the application.[9] Without the information obtained during the intrusion onto Holmes' property, Pastore simply had no personal knowledge of the soil type on the Property. Additionally, although much of Pastore's report was allowed to stand because it was based on information gleaned from other sources and not the intrusion, none of the remaining report contains sufficient information to contradict Frisella's classification of the Property as "silt loam." As such, the only site specific evidence properly before the Board was the soil analysis conducted by Frisella. Thus, when the Board relied on a "considerable dispute over . . . existing soil types" in reaching its decision, this Court is satisfied the Board erred, which resulted in an arbitrary and capricious decision.
 E DEM Authority to Issue Permits
As an additional ground for reversal, Holmes argues the Board failed to heed the Court's prior directives and admonishments from prior cases regarding DEM's authority to issue permits and variances for an ISDS. According to Holmes, the Board's decision in this case clearly ignores this Court's prior holding in Dunn v. TheTown of Charlestown Zoning Bd. of Review. No. 2003-0710, 2007 WL 4471142 (R.I. Super. Nov. 30, 2007). Conversely, the Board and the Intervenors argue this case is factually distinguishable from Dunn, because DEM requirements constitute "a starting point" and that the present case is "filled with contradictory expert testimony upon which the disapproving Board members could reasonably find that the conditions in the Ordinance regarding special use permits had not been met by [Holmes]." Although the *Page 31 
Court recognizes the existence of conflicting expert testimony in this case, and a Town's ability to impose additional restrictions, the Court once again is concerned by the Board's apparent unwillingness to afford DEM's authority to issue permits and grant variances for ISDS systems the appropriate deference. The Court is especially troubled by the Board's decision to deny the application based in part on criteria specifically considered by DEM when it grants a variance.
In Dunn, the Court discussed in detail the process by which DEM reviews an applicant's submission for an ISDS permit and a variance. The Court began by stating it was "troubled by the Board's seeming complete disregard of the expert opinions and determinations implicit in DEM's approval of the proposed ISDS."Id. at 8. The Court went on to note that "R.I.G.L. 2-1-21(a)(2) provides that a city or town council may raise an objection to the proposed construction [of an ISDS system] within the forty five day objection period. After the statutory time for objection passes, the Board lacks authority to arbitrarily override and effectively revoke permits and/or approvals issued by DEM." Id. at 9. Noting the property inDunn was located in a flood plain, the Court enumerated the factors considered by DEM in granting a variance:
 1) Public health;
 2) Any drinking water supply or tributary thereto, including, but not limited to, the cumulative impacts of the system to the surrounding area as described in SD 20.01(g);
 3) Any body of water including, but not limited to, impacts on groundwater and/or surface water quality and to the ability of the waterbody to support and/or maintain plant and wildlife as well as other designated water uses;
 4) Public use and enjoyment of any recreational resource; and
 5) Surrounding persons or property as a potential cause of any public or private nuisance. DEM Regulations SD 20.00(c). Id. at 10.
The Court went on to note that all of this information is reviewed by the ISDS program's staff engineers who "must determine whether granting a variance `would be contrary to the public health, the public interest of the environment.' DEM Regulations SD 20.01(a)."Id. A *Page 32 
final written recommendation is then submitted to the director who "is required to grant the request for a variance upon a determination that such variance `will not be contrary to the public health, the public interest, or environmental quality.'"Id.
Moreover, the Court stated an applicant should ordinarily be entitled to rely on permits and approvals granted by DEM. In particular, this Court stated,
 [g]iven the arduous, in depth, and often expensive vetting process previously described, this Court finds that an applicant should ordinarily be entitled to rely on permits and approvals granted by DEM. Because it employs the services of highly qualified environmental engineers and biologists to evaluate proposals, the DEM is uniquely positioned to approve or deny proposed ISDS systems and to assess the viability of applications for permits to alter fresh water wetlands. This Court finds that DEM approval of a proposed ISDS should be given weight and carefully considered by a zoning board of review and should not simply be dismissed or ignored.
 The DEM's approval is even more significant in the instant case, in which it granted Appellant's request for a variance. Such approval indicates that the DEM was satisfied that construction would not be contrary to public health, the public interest, or environmental quality. Id.
The Town did not appeal this Court's decision.
Here, Holmes submitted an application to DEM and received DEM's approval for both an ISDS and a variance. However, despite these approvals, the Board's decision still noted concerns over whether the "public convenience and welfare will be substantially served," the effect of the proposal "on surrounding wetlands and properties," and that the project "may be inimical to the public health, safety, morals and general welfare of the community." The Board's decision also notes that "runoff may flow off site and exacerbate flooding that occurs on the road and contiguous properties." The Court is troubled by these comments because they fall squarely within the gambit of issues DEM has already thoroughly and carefully reviewed prior to issuing the permit and variance. The flooding of public roadways or contiguous properties is clearly a *Page 33 
nuisance, and one of the exact issues DEM considers when reviewing an application for a variance. DEM, with its numerous technical experts, reviewed the proposal and was satisfied there would be no nuisance caused by the installation of an ISDS and granted the permit. Moreover, similar to the board in Dunn, which failed to delineate why its "environmental reservations" were not remedied by DEM's approval, the Board's decision does not provide any reason why the Board's environmental concerns were not alleviated by DEM's thorough and expert review of the ISDS. Indeed, as noted by one member of the Board voting to approve, "[n]o one challenged DEM's approval which weighs very heavily." As such, this Court holds that a board's decision must — at a minimum — state the reasons for disagreeing with DEM's assessment of an ISDS application.
In this case, the Board's decision is devoid of any reference to why the Board disagreed with DEM's assessment of Holmes' application. To the contrary, the Court finds the Board's decision especially disturbing in light of a number of comments made by Board members who ultimately voted to deny Holmes' application. For instance, one member of the Board who voted to deny the application stated, "DEM does not give a permit for drinking water. They give a permit for an ISDS." However, when considering an applicant's request for a variance one of the enumerated factors for DEM to consider is "[a]ny drinking water supply or tributary thereto." Further, the same Board member also stated, "I want to throw in my two cents. I think that [another Board member]'s comment about DEM, that if it's good enough for DEM, it's good enough for us. I don't think that's true. I think that DEM is only our starting point." Another Board member who voted to deny the application stated, "[w]e are the only body that can attempt to monitor. That's not the right word . . . To be the protectors of our environment. DEM tends to give out septic system approvals pretty willing." Although in the abstract these *Page 34 
comments express a general disagreement with DEM's actions and authority, they do not provide any rationale as to why the Board disagreed with DEM's assessment of Holmes' application. Rather, these comments are indicative of a mischaracterization or misunderstanding of this Court's explanation of DEM's roll in the permitting process. As a result, this Court is satisfied the Board erred in judgment when it failed to discuss or outline why it was unsatisfied with the conclusions reached by DEM after reviewing Holmes' application. After a review of the entire record, this Court is satisfied the Board-in failing to discuss why it disagreed with DEM — simply dismissed or ignored DEM's approval, the result of which is an arbitrary and capricious decision.
 IV Remedy
Based on the foregoing, this Court finds that a reversal and not a remand of the Board's decision is the appropriate relief. Where it is possible a municipal board or administrative agency has made findings of fact and based its decision on the requisite legal criteria, though those findings are not reflected in the record, remand is appropriate. See East Greenwich Yacht Club v.Coastal Res. Mgmt. Council,118 R.I. 559, 568, 376 A.2d 682, 687 (R.I. 1977). However, when the court can fashion an appropriate remedy, courts are cautious to avoid a remand that gives a board a second chance to make findings which can be unduly prejudicial to appellants by causing unreasonable delay and further litigation expenses. See,e.g., Roger Williams College v. Gallison,572 A.2d 61, 62-63 (R.I. 1990). In the case at bar, a full evidentiary presentation was made by Holmes concerning the relevant issues for a special-use permit over the course of six hearings over an eleven month period. After a review of the record, this Court is satisfied a remand is unnecessary because ample evidence demonstrates Holmes met the criteria for the issuance of a special-use permit. *Page 35 
 V Conclusion
Based on the foregoing, the decision of the Board denying Holmes' request for a special-use permit is reversed. After a thorough review of the entire record, this Court finds the Board's decision was arbitrary and capricious, clearly erroneous in view of the reliable, probative and substantial evidence of the record, and affected by error of law.
Counsel for Holmes shall submit an appropriate order for entry in accordance with this Decision within ten (10) days of the date of entry of this Decision.
[1] Denitrification is a process by which wastewater is purged of nitrate-nitrogen. As wastewater collects it, contains high level of nitrates, which if released into the enivorment are potentially harmful, especially to water ecosystems. Specfically, denitrification refers to the process wherein nitrate-nitrogen is converted into nitrogen gas, which is then released into the atmosphere. This process effectively removes nitrogen from any wastewater discharge rendering it less harmful to any nearby water ecosystems.
[2] Section 218-24(J)(3) of the Ordinance requires four (4) votes of approval for the issuance of a special use permit, it provides:
 [t]he concurring vote of four of the five members of the Board sitting at a hearing shall be required to decide in favor of an applicant on any matter within the discretion of the Board upon which it is required to pass under the ordinance, including variances and special use permits.
[3] The issues of groundwater flow and wetlands were handled later in the proceedings by Holmes' other expert witnesses Urish and Steere.
[4] As is evidenced by the conflicting testimony of Frisella and Szczsponik, the distinction of whether or not a plan must accommodate gross or net runoff is critical. Generally, in towns that have adopted specific criteria for storm water management, it is specified as to whether the applicant must deal with the net increase in storm water caused by the development or whether all runoff must be accounted for. In this case, the Board's request to Holmes to create a one hundred (100) year storm plan only compounded this problem. As mentioned repeatedly, the Town has no published regulations for dealing with storm water runoff. As a result, Holmes was left to guess whether to plan for net or gross runoff.
[5] In reviewing the record, this Court is unable to ascertain how Mainelli determined Homles' application constituted cut number 521.
[6] As the facts indicate, the WMC had not promulgated any rules or regulations for storm water management at the time of Holmes' hearing. No party has indicated to the Court the WMC has since passed any regulations, and the Court has been unable to find any through its own research.
[7] Holmes advances numerous arguments as to why the Board erred and its decision should be reversed. In its decision, the Court has elected to highlight what it considers the most noteworthy violations by the Board. As such, the Court does not address every ground for reversal briefed by Holmes.
[8] For example, section 82-314 of the Jamestown Zoning Ordinance entitled "High groundwater table and impervious layer overlay district" provides in section 82-314(B)(6) that:
 "[p]roposals shall provide stormwater controls demonstrating that the increase in the difference between the predevelopment and post development volume of runoff from a ten-year 24-hour storm will be contained on site. For the purposes of this calculation the following table will be used [a table follows with percentages for various surfaces].
[9] After reviewing Pastore's testimony, the Court notes the classification of "silt loam" versus "sand loam" appears to be one of considerable discretion by the evaluator. Nevertheless, for the purposes of its decision, the Board only had the classification by Frisella properly before it.